IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:15-CR-00171-FL-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND |
| | ) | RECOMMENDATION |
| COREY TYON WINSTEAD, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court on the motion by Defendant Corey Tyon Winstead

("Defendant") to suppress evidence seized by law enforcement officers and statements made by

Defendants following a traffic stop on June 14, 2014. [DE-19]. The Government filed a response

in opposition to the motion [DE-23], and the undersigned held an evidentiary hearing on September

3, 2015, to further develop the record. Hr'g Tr. [DE-27]. Accordingly, this matter is ripe for

review. For the reasons stated below, it is recommended that Defendant's motion to suppress be

granted in part and denied in part.

## I. PROCEDURAL BACKGROUND

On May 27, 2015, a Grand Jury sitting in the Eastern District of North Carolina charged

Defendant by Indictment with one count of knowingly and intentionally possessing with the intent

to distribute twenty-eight (28) grams or more of cocaine base (crack), a Schedule II controlled

substance, in violation of 21 U.S.C. § 841(a)(1). [DE-1]. At the suppression hearing, Defendant

submitted nine exhibits: an aerial photograph of the Heart of Wilson Motel and surrounding area

(Def. Ex. 1), an aerial photograph of the Heart of Wilson Motel and parking lot (Def. Ex. 2), an

aerial photograph showing a general overview of the Nash and Jackson cross streets (Def. Ex. 3),

an aerial photograph showing the intersection of Nash and Jackson streets (Def. Ex. 4), an aerial

photograph showing the intersection of Jackson and Broad streets (Def. Ex. 5), an aerial photograph showing the intersection of Jackson and Kenan streets (Def. Ex. 6), an aerial photograph showing the intersection of Jackson and Hines streets (Def. Ex. 7), an aerial photograph showing the intersection of Hines and Henry streets (Def. Ex. 8), and an application for a search warrant (Def. Ex. 9).

The Government presented the testimony of Captain Keith Pendergrass ("Captain Pendergrass") of the Wilson Police Department, who conducted the traffic stop on June 14, 2014, Detective Jason Corprew ("Detective Corprew"), a Task Force Officer of the Wilson Police Department and the Drug Enforcement Administration ("DEA"), who assisted with the execution of the search warrant, and Detective Chelsea Sanders ("Detective Sanders") of the Wilson Police Department, who authored the affidavit used to obtain the search warrant for Defendant's room at the Heart of Wilson Motel on June 14, 2014. The Government also submitted seven exhibits: an aerial photograph showing an expanded view of the Heart of Wilson area (Gov't Ex. 1), an aerial photograph showing the Heart of Wilson Motel and the Western Sizzlin restaurant (Gov't Ex. 1A), an aerial photograph showing the Heart of Wilson Motel (Gov't Ex. 1B), an aerial photograph showing the intersection of Nash and Jackson streets (Gov't Ex. 1C), an aerial photograph showing Hines Street (Gov't Ex. 1D), an aerial photograph showing the Heart of Wilson with hand-drawn directional notations, admitted for illustrative purposes only (Gov't Ex. 2B), and a CAD report showing a call log of law enforcement calls to the Heart of Wilson Motel from January 2014 to June 2014 (Gov't Ex. 2). All exhibits were admitted without objection.

## II. STATEMENT OF THE FACTS

### A.    Testimony of Captain Pendergrass

Captain Pendergrass oversees the Criminal Investigations department at the Wilson Police

Department, which is comprised of the following departments: major case investigations, homicides, white collar investigations, juvenile investigations, and forensics. He has been employed with the Wilson Police department for almost 24 years of his 26-year law enforcement career, and had numerous hours of specialized training in varying subjects, including driving, criminal investigation, patrol techniques, and driving while impaired ("DWI") detection. Captain Pendergrass was working on the evening of June 14, 2014, which was the weekend after graduation in Wilson. The Wilson Police Department had designated that weekend as a special assignment weekend, with officers trying to set the tone for the summer. The police department (with the assistance of other local agencies and federal agencies) was out that weekend holding checkpoints, patrolling, and executing search warrants. Hr'g Tr. [DE-27] at 5-7.

Shortly after midnight on June 14, 2014, Captain Pendergrass was out on patrol, heading eastbound on Nash Street towards the police station in the downtown area of Wilson. Captain Pendergrass testified that he was driving an unmarked white 2012 Ford Crown Victoria. At that time of evening, there was no other traffic. As Captain Pendergrass was heading towards the police station, he observed a vehicle exiting the parking lot of the Heart of Wilson Motel. Captain Pendergrass explained that the Heart of Wilson is a small motor lodge in downtown Wilson, which was popular in the past but has recently fallen into a state of decay. Criminal activity at the motel has increased in the last five to ten years, and Captain Pendergrass stated that "it's almost like a rent by the hour, if you will, type motel." *Id.* at 8. Captain Pendergrass testified that the Wilson Police Department is called out frequently to the Heart of Wilson, to serve warrants, for drug violations, and to respond to reports of car break-ins. *Id.* at 8-9.

Captain Pendergrass was traveling east on Nash Street and had just passed through the intersection of Nash and Whitehead (which runs perpendicular to Nash Street) when he encountered

3

a metallic-colored vehicle pulling out of the Heart of Wilson Motel. Captain Pendergrass testified that the vehicle exited the motel parking lot less than a hundred feet in front of him, and while Captain Pendergrass did not have to slam on his brakes, he did have to slow down for the vehicle. Captain Pendergrass stated that there is a Western Sizzlin restaurant directly across from the Heart of Wilson on Nash Street. At first, he believed the vehicle was leaving the Heart of Wilson and crossing Nash Street to enter the driveway of Western Sizzlin. Instead, Captain Pendergrass stated that the vehicle made a wide u-turn, crossing over into the westbound lanes of Nash Street, before turning back to head east on Nash Street. Captain Pendergrass testified that while making this turn, the vehicle crossed over the solid yellow line into the westbound lanes of Nash Street. *Id.* at 8-10.

Using Gov't's Ex. 1B, Captain Pendergrass explained that he was traveling east on Nash Street and saw the vehicle come out of the Heart of Wilson driveway closest to Bruton Street, adjacent from the Western Sizzlin's driveway. After seeing the wide turn, Captain Pendergrass then followed the vehicle as it traveled down Nash Street to the Jackson Street intersection. At that time, there was a stoplight (which emitted either a steady red or a steady green light) at that intersection.[1] When the vehicle approached the stoplight, the traffic signal was emitting a steady green light. Utilizing Gov't's Ex. 1C, Captain Pendergrass stated that when the vehicle reached the Nash and Jackson Street intersection, there was no traffic on either Nash or Jackson Streets. The vehicle stopped at the green light for ten or twelve seconds, activated its right turn signal, and then turned right onto Jackson Street. Captain Pendergrass also noted that from the moment he saw the vehicle make a wide turn initially to the right-hand turn on Jackson Street, he observed that the vehicle was

---

[1] Captain Pendergrass testified that since the June 14, 2014 traffic stop, the traffic pattern at the Nash and Jackson intersection has changed. The stoplight has been removed and the traffic on Nash Street is now free-flowing. Stop signs have been installed on both sides of Jackson Street.

4

unsure and unsteady. He testified that he did not know whether the driver was impaired, particularly since the vehicle had come out of the Heart of Wilson and stopped at the green light. Captain Pendergrass stated that he stayed behind the vehicle after the turn and followed it down Jackson Street. Hr'g Tr. [DE-27] at 12-16.

As to the vehicle's speed, Captain Pendergrass testified that the vehicle was not speeding, but he thought the driving was "almost unsure" as it was "almost stop and go" with "a bit of hesitation." *Id.* at 16. Captain Pendergrass continued to follow the vehicle down Jackson Street. The vehicle reached the Jackson and Broad intersection, which is marked by a stop sign, and Captain Pendergrass testified that the vehicle stopped for a long time at the stop sign as well. Captain Pendergrass stated that there was no other traffic at the intersection, and "all indications [were] that there was something going on with the vehicle or with the driver at that time." *Id.* at 17. Captain Pendergrass also stated that "I'm thinking impairment or the person's just not – unsure of where they're at." *Id.* Captain Pendergrass believed he saw the vehicle use a turn signal, and he observed the vehicle continue to travel forward on Jackson Street until it reached the Jackson and Hines intersection, which Captain Pendergrass stated is depicted on Gov't's Ex. 1D. *Id.*

Once the vehicle turned onto Hines Street, Captain Pendergrass initiated a traffic stop. Captain Pendergrass testified that Hines Street is generally more heavily traveled and has better lighting than the other streets where the vehicle had been driving. He stated that if the driver was intoxicated, the lights on Hines Street made it a safer place for a traffic stop, and for those reasons, he initiated the traffic stop on that street. Captain Pendergrass had "not necessarily" considered stopping the vehicle prior to it turning on Hines Street, because he wanted to follow it after seeing the driver's behavior from the initial encounter. Captain Pendergrass did not think he used the words impairment or intoxication in his traffic report as far as believing the driver to be intoxicated,

5

but testified that "the actions that I described would lead one to believe in my training and any other's training that something was going afoot with the driver." Hr'g Tr. [DE-27] at 19.

Captain Pendergrass testified that after he stopped the vehicle, he radioed the stop in to the police station, and within seconds, other patrol units met him at the location. Given the area's proximity to downtown and the number of units out on special assignment that weekend, other patrol units were able to respond quickly to the scene. Captain Pendergrass also noted that since it is unusual for a captain to perform a traffic stop on a vehicle, other officers generally gather to watch. He testified that he then approached the vehicle, shining his flashlight into the back window, and noticed that there were two occupants inside: a female driver and a male passenger. As Captain Pendergrass approached the vehicle, he noticed the male passenger bringing his hand to his mouth. When Captain Pendergrass was standing next to the vehicle, he noticed that the male passenger was avoiding eye contact and looking away from him. Captain Pendergrass spoke with the driver, whom he identified to be Pansey Nelson ("Nelson"), and took her credentials. During this time, he noticed the passenger was continuing to avoid eye contact and look in the other direction. Captain Pendergrass attempted to engage the passenger in conversation and asked him if everything was alright. Captain Pendergrass stated that when the passenger turned to look at him, "it looked as though he may have been eating a powdered donut or something because I could see – I could see the white stuff around his lips and mouth and him kind of grinding and chewing like he was clenching his teeth and stuff." Id. at 21. Captain Pendergrass testified that once the passenger looked at him, Captain Pendergrass immediately identified the passenger as the Defendant. Captain Pendergrass has arrested Defendant on drug charges in the past and also knew that Defendant had been previously charged with cocaine-related offenses in Wilson. Id. at 19-22.

After obtaining Nelson's information, Captain Pendergrass had her join him behind the

6

vehicle, while other officers stood on the curb on the passenger side of the vehicle watching Defendant. Nelson told Captain Pendergrass that they had just left the Heart of Wilson Motel, which was consistent with what Captain Pendergrass observed himself. Nelson also told Captain Pendergrass that she had picked up Defendant and they were out riding around. Captain Pendergrass testified that at this point, his efforts shifted to Defendant based on what he had observed earlier. Captain Pendergrass had a female officer take Nelson to the front of the vehicle and went back to Defendant, who again was grinding his back teeth like he was chewing something. Based on his training and experience, Captain Pendergrass believed the white substance around Defendant's mouth to be cocaine. At this point, suspecting that Defendant was ingesting drugs, Captain Pendergrass ordered Defendant out of the car. Captain Pendergrass testified "I think I remember making the statement that shit's going to kill you, man. Open your mouth. Let me – spit whatever it is out." *Id.* at 23. Captain Pendergrass was holding a flashlight and checked Defendant's mouth. Defendant stated that he did not have anything, and then opened his mouth and stuck out his tongue. Captain Pendergrass testified that he could see "little crumbs still on [Defendant's] tongue and the white residue right around the corners of his mouth." *Id.* Captain Pendergrass testified that he next put Defendant in handcuffs and conducted a search because of what he had seen inside Defendant's mouth.[2] *Id.* at 21-23.

Captain Pendergrass testified that during the search, he located a flat motel key card in Defendant's pocket. Once Captain Pendergrass located the key, he asked Defendant whether it was a room key for the Heart of Wilson. Captain Pendergrass testified that "it was almost immediately

---

[2] While Captain Pendergrass states that he conducted a "search" of Defendant, the Government does not argue, either in its brief, or at the hearing, that Captain Pendergrass had probable cause to search Defendant. Instead, the Government argues that Captain Pendergrass had reasonable suspicion to perform a *Terry* frisk of Defendant. Further, the Government used "search" and "pat down" interchangeably at the hearing, *see* Hr'g Tr. [DE-27] at 84-85, but substantively argued only that Captain Pendergrass had reasonable suspicion to perform a *Terry* frisk.

you could tell he was very nervous. He was sweating. His whole demeanor and actions changed when I was talking to him about this particular room key. So, you know, that was obviously suspicious to me and I knew that, you know, he was trying to get our attention or my attention away from that room key." *Id.* at 24. Captain Pendergrass stated that he told Defendant the police were going to apply for a search warrant, knowing that Nelson had picked Defendant up from the Heart of Wilson. Finally, Defendant admitted that the room key was for room 131 at the Heart of Wilson prior to being released. Once Captain Pendergrass had the information about the key card, he relayed the information about the traffic stop to Detective Corprew. Detective Corprew was out that weekend with other task force officers working special assignment. Captain Pendergrass described to Detective Corprew all of the information leading up to the actual traffic stop, including the vehicle's departure from the Heart of Wilson very close to Captain Pendergrass' patrol vehicle, the wide turn onto Nash street, and the long stop at the green light. *Id.* at 23-25.

At no point that evening did Captain Pendergrass actually arrest Defendant. The policy of the Wilson Police Department is to release individuals who have ingested controlled substances or who are suspected of having ingested controlled substances and then charge those individuals at a later date. After Captain Pendergrass spoke with Detective Corprew, he released Nelson and Defendant from the scene of the traffic stop. Nelson left separately from Defendant. Captain Pendergrass then returned to the police station and accompanied the other officers to the Heart of Wilson when they executed the search warrant. Hr'g Tr. [DE-27] at 25-29.

On cross-examination, Captain Pendergrass confirmed that he tries to do all parts of his job as professionally as possible, including using language that is precise and accurate, as he did for the report he prepared based on the traffic stop of June 14, 2014. Captain Pendergrass stated that there are only five white Crown Victorias like the one he drove that evening owned by the Wilson Police

8

Department, and they are typically driven by captains. Those vehicles are not equipped with dash cameras. According to Captain Pendergrass, the captains regularly are on call and perform patrol duties. Captain Pendergrass stated that while observing the vehicle make the wide turn out of the Heart of Wilson onto Nash Street and the long pause at the Nash and Jackson intersection, he was following the vehicle from a normal distance, about a car length behind. Captain Pendergrass could see the two occupants, but otherwise could not see anything inside the vehicle. *Id.* at 29-36.

Captain Pendergrass admitted that he never mentioned suspecting that the driver of the vehicle was impaired in the police report. When asked which words in the report would suggest that he thought the driver was impaired, Captain Pendergrass responded with the following: "Wide turn. Stopping at a green light for a good amount of time. Being unsure at Jackson and Kenan. I think they sat there at a stop sign for an extended period of time. So, in the profession that I'm in, you know, I know that they're indicators for impairment." *Id.* at 40. Captain Pendergrass confirmed that he actually stated in the report that "the vehicle appeared to show signs of not knowing where it was" and nowhere in the report did he use the words "unsure" or "unsteady." *Id.* at 40-41. Captain Pendergrass also confirmed that he followed the vehicle for approximately seven blocks before he stopped it near the intersection of Hines and Henry Streets. Captain Pendergrass admitted that Hines is a four-lane road and it is likely to be traveled. *Id.* at 39-42.

Captain Pendergrass confirmed that he illuminated the rear window with his flashlight before first speaking with Nelson. Captain Pendergrass then tried to speak with Defendant, saw Defendant chewing something, and removed Defendant from the vehicle to inspect his mouth. Captain Pendergrass saw off-white crumbs on Defendant's tongue and a white substance in the corner of his lips. Per the police report, Captain Pendergrass identified Defendant as Corey Winstead, with whom he is familiar, detained Defendant, searched the vehicle while Officer Ward and Sergeant Winstead

9

stood by, then searched Defendant's person, reaching into Defendant's pocket to remove the room key card. *Id.* at 42-44.

Captain Pendergrass explained that he had Defendant get out of the vehicle and examined Defendant's mouth before speaking with Nelson at the back of the vehicle. Captain Pendergrass stated that be believed, based on what he had seen, that the substance in Defendant's mouth was cocaine. From Captain Pendergrass' experience with other traffic stops, a common concealing method is to destroy evidence by eating it. Captain Pendergrass had the impression that Defendant had ingested something based on seeing Defendant's hand go to his mouth and seeing the white powdery substance around Defendant's mouth combined with the chewing. *Id.* at 44-46.

On redirect examination, when asked whether Captain Pendergrass' first reaction was that Defendant had eaten a powdered donut, Captain Pendergrass responded with the following: "I don't [sic] think he had eaten a donut because, you know, when I struck up the conversation, he was obviously trying to make – avoid any contact with me, his jaws were clenched together, he was chewing, and when he turned and looked at me I said that's Corey Winstead and I know, you know, he's been charged with cocaine and stuff before. So, I don't [sic] think it was a powdered donut." *Id.* at 46. Captain Pendergrass confirmed that he had observed the actual substances and believed those substances to be something other than a powdered donut. *Id.*

### B. Testimony of Detective Corprew

Detective Corprew is dually sworn with both the Wilson Police Department and the DEA as a Task Force Officer, and has been in law enforcement since 2008. Detective Corprew is assigned to the Special Operations Division in the Wilson Police Department, which is made up of the traffic enforcement unit, narcotics, and the core team, which is a street crimes unit. Detective Corprew has received training for narcotic investigations both in the course of his employment with

10

the Wilson Police Department and with the DEA. On the evening of June 14, 2014, Detective Corprew received a telephone call from Captain Pendergrass, wherein Captain Pendergrass described the details of the traffic stop, including the details as to why Captain Pendergrass stopped the car, the erratic driving, the fact that Defendant was a passenger, and what was observed around Defendant's mouth and on his tongue upon the search and visual inspection of his mouth. Detective Corprew stated that he would use the term erratic driving to describe the vehicle's actions "based on the traffic stop and the traffic patterns that [were] observed" and he used that term because "erratic is something or a pattern of driving that is not consistent with the normal driving demeanor of the motoring public." *Id.* at 49. That evening, Detective Corprew did not actually visit the site of the traffic stop. *Id.* at 47-49.

Detective Corprew was in the same patrol vehicle with Detective Sanders when he received the call from Captain Pendergrass. Detective Corprew relayed the information from Captain Pendergrass to Detective Sanders, and the two stopped at the Heart of Wilson on the way to the police department. Detective Corprew spoke with the night clerk at the motel and learned that Defendant had rented room 131. The night clerk also provided a registration card with Defendant's photo identification and other information. After receiving this information, Detectives Corprew and Sanders left the Heart of Wilson and went to the Wilson Police Department, where a search warrant was written. Detective Corprew also stated that before going to the Heart of Wilson, he had learned from Captain Pendergrass about the room key and Defendant's admission of having a room at the Heart of Wilson. Detective Corprew never spoke with Defendant or Nelson directly on that evening. *Id.* at 49-51.

On cross-examination, Detective Corprew confirmed that he was present at the hotel room when the search was conducted. Detective Corprew stated that he believed the key card listed on

11

the inventory to the search was the same key card that was taken from Defendant's pocket at the traffic stop, and it had not been returned to Defendant. *Id.* at 51-52.

## C.    Testimony of Detective Sanders

Detective Sanders has been employed as a narcotics detective with the Wilson Police Department for over five years, and has received specialized training in narcotics investigations. On the evening of June 14, 2014, she was traveling with Detective Corprew and Detective Seagroves, another narcotics detective. Detective Sanders was informed by Detective Corprew that Captain Pendergrass had stopped Defendant and Nelson after observing them leave the Heart of Wilson, and believed that Defendant had possibly ingested some cocaine during the traffic stop. Detective Sanders did not go to the scene of the traffic stop, but instead stopped at the Heart of Wilson on the way back to the police station. According to Detective Sanders, they stopped at the Heart of Wilson "to check with the night clerk to actually see a list of the manifest of who actually had a room at the residence – or at the motel and also to drop off Detective Seagroves." *Id.* at 54. Detective Sanders saw the list of names, and stated that it also contained the registration of each person at the motel. As to Defendant, Detective Sanders testified that the back side of the registration contained a North Carolina photo identification for Defendant. Detective Sanders stated that Detective Seagroves' role was to stand by the hotel room so that no one could enter or exit while she and Detective Corprew went to the police station. This practice prevents evidence from being disturbed while officers are obtaining warrants. Detective Sanders then went to the police station to meet Captain Pendergrass. Detective Sanders wrote the application for a search warrant and presented it to a magistrate. After the search warrant was signed, Detective Sanders assisted in the execution of the warrant. Detective Sanders did not have direct contact with either Defendant or Nelson on that evening. *Id.* at 52-56.

12

On cross-examination, Detective Sanders confirmed that the information provided in the affidavit given to the magistrate to support probable cause was the information passed from Captain Pendergrass to Detective Corprew to Detective Sanders. The first four paragraphs of that affidavit contain information relating to the traffic stop. Detective Sanders confirmed that Detective Seagroves did not enter the hotel room until the search warrant was obtained, and after being left at the Heart of Wilson, Detective Sanders stood in front of room 131 until the search warrant was obtained. *Id.* at 56-58.

On redirect examination, Detective Sanders stated that after obtaining the search warrant, she returned to the Heart of Wilson along with Detective Corprew. Detective Seagroves assisted them both with the execution of the search warrant. *Id.* at 59-60.

## III. DISCUSSION

Defendant has moved to suppress all statements made to law enforcement and physical evidence seized following the traffic stop on June 14, 2014, on the grounds that the search and seizure violated the Fourth Amendment to the United States Constitution. Specifically, Defendant argues that Captain Pendergrass lacked either probable cause or reasonable suspicion to stop Defendant's vehicle and lacked reasonable suspicion of criminal activity before subjecting Defendant to a *Terry* frisk. Additionally, Defendant argues that Captain Pendergrass performed an illegal search by inspecting Defendant's mouth and removing the key card from Defendant's pocket.

The Fourth Amendment guarantees the right of the people to be secure against unreasonable searches and seizures. U.S. Const. amend. IV. A traffic stop constitutes a seizure within the meaning of the Fourth Amendment, and accordingly, in order to be reasonable a traffic stop must be supported by probable cause that a traffic violation has occurred, *Whren v. United States*, 517 U.S. 806, 809-10 (1996), or reasonable suspicion of criminal activity, *United States v. Arvizu*, 534

13

U.S. 266, 273 (2002) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Drivers and passengers alike are seized during a traffic stop. *Brendlin v. California*, 551 U.S. 249, 257-59 (2007). Additionally, "[t]o justify a patdown of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009).

### A. Captain Pendergrass had Probable Cause to Stop Defendant's Vehicle

Defendant first argues that Captain Pendergrass improperly stopped Defendant's vehicle because he lacked either probable cause of a traffic violation or reasonable suspicion of criminal activity. Def.'s Mot. [DE-19] at 5. In response, the Government argues that Captain Pendergrass observed three separate North Carolina traffic offenses sufficient to provide probable cause to stop Defendant's vehicle: the vehicle made a wide turn out of the Heart of Wilson, crossing over the center line before heading eastbound on Nash Street; the vehicle stopped at a green light in violation of N.C. Gen. Stat. § 20-146(d); and the vehicle made a prolonged stop at a stop sign when no other traffic was present in violation of N.C. Gen. Stat. § 20-161. Hr'g Tr. [DE-27] at 73-75; Gov't's Mot. [DE-23] at 5-6. Additionally, the Government argues that Captain Pendergrass had reasonable suspicion that the driver of the vehicle was impaired. Gov't's Mot. [DE-23] at 6. The undersigned determines that Captain Pendergrass observed the vehicle cross the center line while making the right-hand turn out of the Heart of Wilson parking lot onto Nash Street in violation of N.C. Gen. Stat. § 20-146(d)(1), and thus had probable cause to stop the vehicle.

The Fourth Circuit has held that "when an officer observes a traffic offense or other unlawful conduct, he or she is justified in stopping the vehicle under the Fourth Amendment" and this is true "regardless of the fact that the officer would not have made the stop but for some hunch or

14

inarticulable suspicion of other criminal activity[.]" *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993) (citing *United States v. Cummins*, 920 F.2d 498, 500-01 (8th Cir. 1990) ("When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle.")). The North Carolina statute at issue here, N.C. Gen. Stat. § 20-146(d)(1), provides that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."

In its discussion of the particular statute at issue, the Fourth Circuit has stated that "pursuant to state and federal precedent, when a North Carolina patrol trooper observes a driver swerving out of his or her lane, the trooper has probable cause for a stop." *United States v. Flores*, 368 F. App'x 424, 430 (4th Cir. Mar. 5, 2010) (per curiam) (unpublished). In *Flores*, the Fourth Circuit determined that the defendant's "three readily observable traffic infractions" (crossing the fog line twice and the dotted center line once) supported probable cause for a traffic stop. *Id.* at 426, 430. The court in *Flores* referred to *United States v. Gallardo-Gonzalez*, noting that the Fourth Circuit in that case "concluded, with little difficulty, that a single incident of crossing over the fog line is a violation of [N.C. Gen. Stat. § 20-146(d)(1)]." *Id.* at 430; *see United States v. Gallardo-Gonzalez*, 331 F. App'x 255, 257 (4th Cir. May 22, 2009) (per curiam) (unpublished) ("Contrary to Gallardo-Gonzalez's contention, [§20-146(d)(1)] does not require that the driver be reckless in order for there to be probable cause to stop the vehicle. Rather, because Gallardo-Gonzalez's traffic violation was 'readily observable,' there was probable cause for the stop."). The stop in *Gallardo-Gonzalez* was based both on a violation related to the temporary vehicle tag and a single instance of the car crossing the fog line. *Gallardo-Gonzalez*, 331 F. App'x at 256-57.

Additionally, this court has held that a traffic stop was reasonable and supported by probable

15

cause where an officer saw a driver cross over the fog line during a wide left-hand turn, in violation of N.C. Gen. Stat. § 20-146(d)(1). *United States v. Sessoms*, No. 2:14-CR-1-FL-1, 2014 WL 5822865, at *8 (E.D.N.C. Nov. 10, 2014) (unpublished). Similarly, the North Carolina Court of Appeals has also held that a readily observable violation of state traffic laws constitutes probable cause for a traffic stop. *State v. Osterhoudt*, 222 N.C. App. 620, 629, 731 S.E.2d 454, 460 (2012) (holding that the defendant violated N.C. Gen. Stat. § 20-146(d)(1) when he crossed the double yellow center line once while making a wide right-hand turn and determining that the traffic stop was reasonable); *State v. Hudson*, 206 N.C. App. 482, 484-86, 696 S.E.2d 577, 579-81 (2010) (holding that there was probable cause to support a stop where the officer saw defendant "cross the center dividing line of the northbound lanes and weave back over the fog line two times"), *disc. review denied*, 364 N.C. 619, 705 S.E.2d 360 (2010); *State v. Baublitz*, 172 N.C. App. 801, 807, 616 S.E.2d 615, 619 (2005) (holding that the officer's "observation of defendant's vehicle twice crossing the center line furnished sufficient circumstances to provide . . . probable cause to stop defendant's vehicle").

Here, Captain Pendergrass testified that shortly after midnight on June 14, 2014, as he was traveling towards the downtown area of Wilson on Nash Street, there was no other traffic around and he saw Defendant's vehicle make a wide right-hand turn out of the Heart of Wilson Motel onto Nash Street. Hr'g Tr. [DE-27] at 7-9. Captain Pendergrass testified that during this wide right-hand turn, the vehicle crossed the solid yellow center line into the westbound lanes on Nash Street before continuing to travel eastbound down Nash Street. *Id.* at 9-10. Captain Pendergrass then followed the vehicle for seven or eight blocks before performing a traffic stop in a location that had better lighting and safety conditions. *Id.* at 18. Defendant argues that Captain Pendergrass' explanation is unpersuasive, as the police report does not mention Defendant's vehicle crossing the center line

16

and Captain Pendergrass did not stop the vehicle immediately. "[I]t is the role of the district court to observe witnesses and weigh their credibility during a pre-trial motion to suppress." *United States v. Abu Ali*, 528 F.3d 210, 232 (4th Cir. 2008) (quoting *United States v. Murray*, 65 F.3d 1161, 1169 (4th Cir. 1995)). The undersigned determines, after hearing Captain Pendergrass' testimony and observing his demeanor on the stand during direct and cross-examination, that Captain Pendergrass is credible in his explanation that the "wide turn" described in the police report actually entailed the vehicle crossing the solid yellow center line. Further, while Captain Pendergrass followed the vehicle for seven or eight blocks after observing this traffic violation, he still had probable cause to perform the traffic stop on Hines Street. *Compare United States v. Culp*, 860 F. Supp. 2d 459, 466 (W.D. Mich. 2012) ("Even if [the officer] had probable cause to believe Defendant violated § 257.643 by 'following too closely' at the time he passed [the officer] in the emergency turnaround, that probable cause had become stale by the time [the officer] decided to stop Defendant some eight miles later."), *with Sessoms*, 2014 WL 5822865, at \*8 (determining that the officer had probable cause to stop the defendant's vehicle based on a readily observable violation of N.C. Gen. Stat. § 20-146(d)(1) where the officer followed the vehicle "for a brief distance (one-fourth to one-eighth of a mile) and then stopped the [vehicle]"). Because Captain Pendergrass saw a readily observable violation of N.C. Gen. Stat. § 20-146(d)(1), there was probable cause to support the stop "regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity[.]" *Hassan El*, 5 F.3d at 730. As long as a traffic stop is supported by probable cause, it is reasonable under the Fourth Amendment. *Whren*, 517 U.S. at 810. Thus, the stop here was supported by probable cause and was reasonable under the Fourth

17

Amendment.[3]

### B. Captain Pendergrass had Reasonable Suspicion to Perform a *Terry* Frisk, but Exceeded the Scope of the Frisk

Defendant argues that Captain Pendergrass exceeded the scope of the traffic stop because he did not have reasonable suspicion of criminal activity sufficient to subject Defendant to a pat down *Terry* frisk. Def.'s Mot. [DE-19] at 6-8. Further, Defendant argues that Captain Pendergrass performed an illegal search by inspecting Defendant's mouth and removing the key card from Defendant's pocket. Hr'g Tr. [DE-27] at 88-89. In response, the Government argues that Captain Pendergrass did not exceed the scope of the traffic stop as he had reasonable suspicion that there were illegal drugs present sufficient to subject Defendant to a pat down. Gov't's Mot. [DE-23] at 7-10.

Generally, warrantless searches are "*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (citation and internal quotation marks omitted). "[B]efore an officer 'places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so.'" *United States v. Powell*, 666 F.3d 180, 185 (4th Cir. 2011) (quoting *Sibron v. New York*, 392 U.S. 40, 64 (1968)). A *Terry* frisk permits an officer to "conduct a carefully limited search of the outer clothing" of a person without a warrant when the officer has a reasonable suspicion that the person is armed and dangerous. *Terry v. Ohio*, 392 U.S. 1, 27, 30 (1968). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief

---

[3] Based on this determination, the undersigned does not reach the Government's alternative arguments in support of the traffic stop's legality.

18

that his safety or that of others was in danger." *Id.* at 27. The Fourth Circuit has stated that "[j]udicial review of the evidence offered to demonstrate reasonable suspicion must be commonsensical, focused on the evidence as a whole, and cognizant of both context and the particular experience of officers charged with the ongoing tasks of law enforcement." *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008). This is an objective inquiry, and measures what an officer knew before conducting the pat down. *Powell*, 666 F.3d at 186 (citations omitted). However, "it is entirely appropriate for courts to credit 'the practical experience of officers'" and respect their "training and expertise," as actions that may appear entirely innocent in some contexts may signal the existence of criminal activity in others. *Branch*, 537 F.3d at 336-37 (quoting *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993)).

"If a police officer wants to detain a driver beyond the scope of a routine traffic stop, however, he must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place." *Branch*, 537 F.3d at 336 (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Such justification may include the officer's reasonable suspicion of illegal activity. *Id.* The Fourth Circuit has noted that "all roadside traffic encounters are potentially dangerous for law enforcement officers." *Powell*, 666 F.3d at 186 n.6 (citation omitted). Even so, this "inherent potential danger is not enough, by itself, to justify a patdown." *Id.* (citation omitted). Prior criminal involvement is a relevant factor to be considered in determining whether reasonable suspicion exists. *United States v. Johnson*, 475 F. App'x 19, 19-20 (4th Cir. Aug. 1, 2012) (per curiam) (unpublished) (citing *Powell*, 666 F.3d at 188; *United States v. Holmes*, 376 F.3d 270, 277-78 (4th Cir. 2004)). The Fourth Circuit has been clear, however, that knowledge of prior criminal activity is not enough, standing alone, to justify reasonable suspicion. *Powell*, 666 F.3d at 188 (citing *United States v. Foster*, 634 F.3d 243, 246-47 (4th Cir. 2011)). Further, the Fourth Circuit

19

has also held that "an officer who has reasonable suspicion to believe that a vehicle contains illegal drugs may order its occupants out of the vehicle and pat them down for weapons." *United States v. Rooks*, 596 F.3d 204, 207, 210 (4th Cir.) (citation omitted) (determining that an officer had reasonable suspicion to subject the defendant to a pat down frisk for weapons where there was a strong odor of marijuana emanating from the vehicle and the vehicle's ashtray contained a cigarette butt and a plastic bag, and prior to ordering the defendant out of the car the officer determined that the cigarette but and the plastic bag contained marijuana residue), *cert. denied*, 562 U.S. 864 (2010).

Here, prior to removing Defendant from the vehicle for a pat down frisk, Captain Pendergrass observed the vehicle departing from the Heart of Wilson, an area known for criminal activity, observed Defendant's hand going to his mouth as Captain Pendergrass approached the vehicle, noticed Defendant avoiding eye contact with him, saw Defendant grinding his teeth and chewing something, observed what he believed to be cocaine around Defendant's mouth, and recognized Defendant as someone he knew had been arrested for dealing cocaine previously. Hr'g Tr. [DE-27] at 8-9, 20, 22-23, 46. Considering the totality of the circumstances, the undersigned determines that an objectively prudent officer in the same circumstances would have had reasonable suspicion that illegal drugs were present, sufficient to subject Defendant to a pat down frisk for weapons.[4] *Rooks*, 596 F.3d at 210.

Defendant points to *United States v. Sprinkle*, 106 F.3d 613 (4th Cir. 1997), and *United States v. Foster*, 634 F.3d 243 (4th Cir. 2011), in support of his argument that furtive behavior does not support a finding of reasonable suspicion. Def.'s Mot. [DE-19] at 6-8. The facts of the instant case, however, are distinguishable from the facts in *Sprinkle* and *Foster*. In both of those cases, the

---

[4] Again, the undersigned emphasizes that nowhere does the Government argue that Captain Pendergrass had probable cause to search Defendant based on the presence of illegal drugs.

court determined that the officers lacked reasonable suspicion and specifically remarked on the absence of any narcotics. *Sprinkle*, 106 F.3d at 616 ("[n]either officer saw any drugs, money, guns, or drug paraphernalia in the car. Moreover, [neither of the occupants made] any movement that indicated an attempt to conceal any object inside the car."); *Foster*, 634 F.3d at 246 (referencing *Sprinkle* and noting that the officer also did not see the defendant "in the possession of any drugs, money, weapons or paraphernalia."). The Fourth Circuit has also noted, however, that "an officer who has reasonable suspicion to believe that a vehicle contains illegal drugs may order its occupants out of the vehicle and pat them down for weapons." *Rooks*, 596 F.3d at 210 (citation omitted). The court in *Sprinkle* noted that concealing one's face or identity could be considered in the reasonable suspicion analysis, but "without some stronger indication of criminal activity, this act cannot tip this case to reasonable suspicion." 106 F.3d at 617-18. Here, Captain Pendergrass relied on Defendant avoiding eye contact, in addition to the presence of what he believed to be cocaine around Defendant's mouth coupled with Defendant grinding his teeth and chewing in order to formulate reasonable suspicion—factors the court was clear to specify were not present in both *Sprinkle* and *Foster*. Accordingly, Defendant's reliance on *Sprinkle* and *Foster* is unpersuasive.

While Captain Pendergrass had reasonable suspicion to perform a pat down frisk for weapons on Defendant based on the presence of what he believed to be cocaine around Defendant's mouth, Captain Pendergrass exceeded the scope of the pat down frisk by looking inside Defendant's mouth and removing the hotel key card from Defendant's pocket. A *Terry* frisk permits an officer to "conduct a carefully limited search of the outer clothing" of a person without a warrant when the officer has a reasonable suspicion that the person is armed and dangerous or when an officer has reasonable suspicion that a vehicle contains illegal drugs. *Terry*, 392 U.S. at 27, 30; *Rooks*, 596 F.3d at 210. A *Terry* frisk is justified for "the protection of the police officer and others nearby, and it

21

must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 29. In describing the permissible frisk in *Terry*, the Supreme Court noted that the officer

> patted down the outer clothing of [the defendant] and his two companions. He did not place his hands in their pockets or under the outer surface of their garments until he had felt weapons, and then he merely reached for and removed the guns. He never did invade Katz' person beyond the outer surfaces of his clothes, since he discovered nothing in his patdown which might have been a weapon. [The officer] confined his search strictly to what was minimally necessary to learn whether the men were armed and to disarm them once he discovered the weapons. He did not conduct a general exploratory search for whatever evidence of criminal activity he might find.

*Id.* at 29-30. Additionally, the plain feel doctrine "holds that contraband discovered during a lawful *Terry* stop is admissible so long as the search does not exceed the bounds permitted by *Terry*." *United States v. Raymond*, 152 F.3d 309, 312 (4th Cir. 1998) (citing *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993)). "Thus, if the contour or mass of the object makes its identity immediately apparent, the officer may lawfully seize it." *Id.* (citing *Dickerson*, 508 U.S. at 375). "Once an officer has determined that the object is not a weapon, however, and if its shape or size does not indicate its contraband nature, the search must stop." *Id.* (citing *Dickerson*, 508 U.S. at 378).

Here, Captain Pendergrass looked inside Defendant's mouth with a flashlight and checked under his tongue, prior to patting him down and seizing a motel key card from one of Defendant's pockets. After the motel key card was seized, Defendant later admitted that he had rented a room at the Heart of Wilson. The actions taken by Captain Pendergrass in looking inside Defendant's mouth and seizing the key card do not represent a "carefully limited search of the outer clothing" of Defendant. *Terry*, 392 U.S. at 30. In *United States v. Swann*, 149 F.3d 271, 273-77 (4th Cir. 1998), the Fourth Circuit upheld the removal of a hard object in the defendant's sock which turned out to be a stack of five stolen credit cards, where the officer did not know what the object was when

22

he encountered it and the object "was approximately the same size and shape as a box cutter with a sharp blade, which is often used as a weapon." The court in *Swann*, however, was careful to note that "[a] similarly shaped hard object in Swann's pocket certainly would have raised no alarms, as there could be innumerable innocent explanations for it." *Id.* at 276. Here, as the single card was located in Defendant's pocket, the *Swann* holding does not apply, and the seizure of the key card exceeded the scope of the *Terry* frisk.

Generally, absent an exception, the exclusionary rule requires the suppression of evidence discovered and seized in violation of the Fourth Amendment. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963); *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992) ("If the initial traffic stop was illegal or the officers exceeded the stop's proper scope, the seized contraband is excluded under the 'fruit of the poisonous tree doctrine.'") (citations omitted).[5] Accordingly, where Captain Pendergrass exceeded the scope of the *Terry* frisk, it is recommended that the key card to the Heart of Wilson and Defendant's admission that he had rented a room at the motel be suppressed.

## C. Sufficient Untainted Evidence Supports the Search Warrant

The Government argues that the ultimate or inevitable discovery exception to the exclusionary rule applies here, to permit the introduction of the crack cocaine ultimately seized from Defendant's motel room at the Heart of Wilson. Gov't's Mot. [DE-23] at 10-11. Specifically, the Government argues that even if Captain Pendergrass had not seized the motel key from Defendant and had not obtained Defendant's admission that he rented the room at the Heart of Wilson, officers would have learned about the motel room from independent sources. *Id.* The Government cites to

---

[5] The Government argues that the inevitable discovery doctrine applies to permit the introduction of the evidence seized from Defendant's motel room, but does not argue that the inevitable discovery doctrine or any other exception to the exclusionary rule applies to permit the introduction of the motel key card and Defendant's admission of renting a room at the Heart of Wilson. Moreover, as discussed below, the inevitable discovery doctrine does not apply to these facts.

23

three pieces of evidence in support of its argument: (1) Captain Pendergrass' observation of the vehicle leaving from the Heart of Wilson; (2) Pansey Nelson's statement that she picked Defendant up from the Heart of Wilson; and (3) Detective Sanders observing the manifest at the Heart of Wilson and seeing that Defendant had rented a room. *Id.* In response, Defendant argues that the inevitable discovery does not apply since all of the information used to obtain the search warrant resulted from the wrongful stop. Hr'g Tr. [DE-27] at 67-68.

The inevitable discovery doctrine provides that unlawfully seized evidence may be admitted "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means[.]" *Nix v. Williams*, 467 U.S. 431, 444 (1984). A related doctrine is the independent source doctrine, which provides that "evidence seized pursuant to a subsequently issued warrant, although initially discovered during [an illegal search], is admissible so long as 'the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue.'" *United States v. Walton*, 56 F.3d 551, 554 (4th Cir. 1995) (quoting *Murray v. United States*, 487 U.S. 533, 542 (1988)). Neither of these doctrines applies here, because the Government does not argue that the unlawfully-acquired evidence (the motel key card and Defendant's admission of renting a room at the motel) are admissible. Instead, the Government argues that the evidence seized from Defendant's motel room pursuant to a search warrant would have been discovered through independent sources. Accordingly, given that some of the unlawfully-obtained information was included in the probable cause affidavit in support of the search warrant, the proper inquiry is whether the inclusion of the tainted evidence invalidates the search warrant. The Fourth Circuit has held that "[t]he inclusion of tainted evidence does not invalidate a search warrant if enough untainted evidence supports it . . . ." *United States v. Wright*, 991 F.2d 1182, 1186 (4th Cir. 1993) (determining that sufficient

24

probable cause supported a warrant, even though some unlawfully-obtained evidence had been offered in the affidavit supporting probable cause) (citing *United States v. Whitehorn*, 813 F.2d 646, 649 (4th Cir. 1987), *cert. denied*, 487 U.S. 1234 (1988)). Probable cause to support a search warrant requires simply "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

Here, the tainted evidence consists of the motel key card and Defendant's statement of having rented room 131 at the Heart of Wilson Motel, which were discovered when Captain Pendergrass exceeded the scope of a lawful *Terry* frisk. The affidavit authored by Detective Sanders to apply for the search warrant includes the fact that a room key to the Heart of Wilson was found on Defendant's person, but does not include Defendant's statement that he had rented room 131. Def.'s Ex. 9. Additionally, the affidavit details the traffic stop of Defendant's vehicle, including Defendant's evasive behavior and the fact that the vehicle was seen leaving from the Heart of Wilson, the substance believed to be cocaine around Defendant's mouth, Pansey Nelson's statement that Defendant was staying at room 131 at the Heart of Wilson, the fact that Detective Sanders verified with the Heart of Wilson manifest that Defendant had rented room 131 at the Heart of Wilson, and the officers' knowledge of Defendant as a chronic narcotics offender in the area. *Id.*

The undersigned must evaluate the affidavit, excluding the illegally-obtained information, and determine whether the untainted evidence sets forth "a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. Here, the affidavit sets forth the following facts independent of the unlawfully-obtained key card and Defendant's admission of renting a room: (1) the details of the traffic stop of Defendant's vehicle, including Defendant's evasive behavior and the fact that the vehicle was seen leaving from the Heart of Wilson; (2) the substance believed to be cocaine around Defendant's mouth; (3) Pansey Nelson's

statement that Defendant was staying at room 131 at the Heart of Wilson; (4) the fact that Detective Sanders verified with the Heart of Wilson manifest that Defendant had rented room 131 at the Heart of Wilson; and (5) the officers' knowledge of Defendant as a chronic narcotics offender in the area. Def.'s Ex. 9. Considering the totality of the circumstances and excluding the tainted evidence, the facts offered in the affidavit set forth "a fair probability that contraband or evidence of a crime" would be found in Defendant's room at the Heart of Wilson. *Gates*, 462 U.S. at 238. Thus, as sufficient probable cause supports the affidavit submitted to apply for the search warrant even excluding the tainted evidence, it is recommended that Defendant's motion to suppress be denied as to the evidence seized from Defendant's motel room at the Heart of Wilson.

## IV. CONCLUSION

For the reasons set forth above, it is RECOMMENDED that Defendant's Motion to Suppress [DE-19] be GRANTED IN PART and DENIED IN PART. It is recommended that the key card to the Heart of Wilson recovered from Defendant's pocket and Defendant's admission of renting room 131 at the Heart of Wilson be suppressed and that Defendant's Motion to Suppress [DE-19] be denied as to all other evidence seized.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until **Thursday, December 17, 2015** to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified

26

in local rules), 72.4(b). Any response to objections shall be filed by within **14 days** of the filing of the objections.

If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation. *See Wright v. Collins*, **766 F.2d 841, 846-47 (4th Cir. 1985).**

SUBMITTED, the **3** day of December 2015.

Robert B. Jones, Jr.
United States Magistrate Judge